UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | | |
|---|---|---|
| KEVIN EASLEY, | : | Case No. 3:11-cv-377 |
| | : | |
| Plaintiff, | : | Judge Timothy S. Black |
| | : | |
| vs. | : | |
| | : | |
| COMMISSIONER OF | : | |
| SOCIAL SECURITY, | : | |
| | : | |
| Defendant. | : | |

**ORDER THAT: (1) THE ALJ'S NON-DISABILITY FINDING IS FOUND SUPPORTED BY SUBSTANTIAL EVIDENCE, AND AFFIRMED; AND (2) THIS CASE IS CLOSED**

This is a Social Security disability benefits appeal. At issue is whether the administrative law judge ("ALJ") erred in finding the Plaintiff "not disabled" and therefore unentitled to disability insurance benefits ("DIB") and Supplemental Security Income ("SSI"). (*See* Administrative Transcript ("Tr.") (Tr. 22) (ALJ's decision)).

**I.**

In June 2008, Kevin Easley ("Plaintiff") filed an application for DIB and SSI. (Tr. 179-195).[1] Plaintiff alleged that he became disabled on March 21, 2008, due to severe arthritis, cervical spinal disk degeneration, and a detached retina in the left eye. (Tr. 179, 184).

---

[1] Plaintiff previously applied for disability benefits in December 2005 and was found not disabled pursuant to an ALJ's decision of March 20, 2008. (Tr. 9, 142-47, 181). Plaintiff did not seek judicial review of this decision in federal court (Tr. 36), and the time to do so has expired. *See* 42 U.S.C. 405(g).

Plaintiff's application was denied initially and upon reconsideration. (Tr. 1, 22). Plaintiff, his attorney, and a vocational expert appeared at a hearing before an ALJ in November, 2010. (Tr. 32-58). The ALJ issued her decision on March 11, 2011, finding that Plaintiff was not disabled as defined by the Social Security Act. (Tr. 22). The ALJ determined that Plaintiff retained the ability to perform a range of medium work that allowed him to perform a significant number of jobs in the economy.[2] (Tr. 21-22). The Appeals Council denied review, making the ALJ's decision the final decision of the Commissioner. (Tr. 1-5). Plaintiff then commenced this action in federal court for judicial review of the Commissioner's decision pursuant to 42 U.S.C. § 405(g).

Plaintiff is now 49 years old. (Tr. 21). He has a twelfth grade education. (Tr. 38). Plaintiff has not been married and lives in an apartment. (Tr. 16). His past relevant work was as a transmission assembler, shipping and receiving clerk, and hotel housekeeper.. (Tr. 20). Plaintiff alleges that he is unable to work due to back and neck pain, muscle spasms, chest pain, migraine headaches, and left eye blindness. (Tr. 16). However, he also stated that he stopped working as a housekeeper because he was "tired of the work;" he stopped working as a donations collector because the work was seasonal; and he stopped working as a driver for a limousine company because his driver's license was suspended for failure to pay moving violations. (Tr. 432).

---

[2] "'Medium work' means exerting twenty to fifty pounds of force occasionally, and/or ten to twenty-five pounds of force frequently, and/or greater than negligible up to ten pounds of force constantly to move objects. Physical demand requirements are in excess of those for light work." Ohio Administrative Code § 4121-3-34(B)(2)(c) (2012).

The ALJ's "Findings," which represent the rationale of her decision, were as follows:

1. The claimant meets the insured status requirements of the Social Security Act through December 31, 2008, but not thereafter.

2. The claimant has not engaged in substantial gainful activity since March 21, 2008, the onset date (20 CFR 404.1571 *et seq.*, and 416.971 *et seq.*).

3. The claimant has the following severe impairments: cervical degenerative disc disease and a detached retina and blindness in the left eye (20 CFR 404.1520(c) and 416.920(c)).

4. The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925, and 416.926).

5. After careful consideration of the entire record, the undersigned finds claimant has the residual functional capacity to perform medium work as defined in 20 CFR 404.1567(c) and 416.967(c) except that he perform no commercial driving as part of job duties.

6. The claimant is unable to perform any past relevant work (20 CFR 404.1565 and 416.965).

7. The claimant was born on September 5, 1962, and was 45 years old, which is defined as a younger individual age 18-49, on the alleged disability onset date (20 CFR 404.1563 and 416.963).

8. The claimant has at least a high school education and is able to communicate in English (20 CFR 404.1564).

9. Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that he claimant is "not disabled," whether or not the claimant has transferable job skills (*See* SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

> 10. Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569, 404.1569(a), 416.969, and 416.969(a)).
>
> 11. The claimant has not been under a disability, as defined in the Social Security Act, from March 21, 2008, through the date of this decision (20 CFR 404.1520(g) and 416.920(g)).

(Tr. 11-22).

In sum, the ALJ concluded that Plaintiff was not under a disability as defined by the Social Security Regulations and was therefore not entitled to DIB and SSI. (Tr. 22).

On appeal, Plaintiff argues that: (1) the Commissioner erred when he issued a decision denying Plaintiff's application that was not based on substantial evidence; and (2) the Commissioner erred when he concluded that Plaintiff's alleged substance abuse was a factor, before determining that Plaintiff was disabled.

## II.

The Court's inquiry on appeal is to determine whether the ALJ's non-disability finding is supported by substantial evidence. 42 U.S.C. § 405(g). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales,* 402 U.S. 389, 401 (1971). In performing this review, the Court considers the record as a whole. *Hephner v. Mathews,* 574 F.2d 359, 362 (6th Cir. 1978). If substantial evidence supports the ALJ's denial of benefits, that finding must be affirmed, even if substantial evidence also exists in the record upon which the ALJ could have found plaintiff disabled. As the Sixth Circuit has explained:

> "The Commissioner's findings are not subject to reversal merely because substantial evidence exists in the record to support a different conclusion. The substantial evidence standard presupposes that there is a "zone of choice" within which the Commissioner may proceed without interference from the courts. If the Commissioner's decision is supported by substantial evidence, a reviewing court must affirm."

*Felisky v. Bowen*, 35 F.3d 1027, 1035 (6th Cir. 1994).

The claimant bears the ultimate burden to prove by sufficient evidence that he is entitled to disability benefits. 20 C.F.R. § 404.1512(a). That is, he must present sufficient evidence to show that, during the relevant time period, he suffered an impairment, or combination of impairments, expected to last at least twelve months, that left him unable to perform any job in the national economy. 42 U.S.C. § 423(d)(1)(A).

### A.

Plaintiff's medical record:

Treatment notes from July, August, and October 2007 indicate that Plaintiff exhibited full range of motion, full motor strength, intact sensation, and a steady gait. (Tr. 342, 391, 394). Although a CT scan of the cervical spine on July 10, 2007 showed anterior marginal spurring at C5-C7, the report nevertheless showed normal vertebral body heights and preserved disc spaces. (Tr. 400). Indeed, treatment notes from July and August 2007 refer to malingering behavior by Plaintiff. (Tr. 339, 356).

In June 2008, Plaintiff had an interview with the Ohio Rehabilitation Services Commission, where he reported that he left his job as a housekeeper in 2005 because he

was "tired of the work;" he stopped working as a donations collector because the work was seasonal; and he left his job as a driver for a limousine company because his driver's license was suspended for failure to pay numerous moving violations. (Tr. 432).

On June 28, 2008, Plaintiff sought emergency room treatment for muscle stiffness and soreness in the left side of his neck. (Tr. 418). Dr. Doerger, the attending physician, noted tenderness upon rotation, particularly to the left trachea midline, and tenderness in the left paracervical musculature and upper trapezius. (Tr. 420). However, Plaintiff's neck was supple, and he had full range of motion. (Id.) Neurological examination showed symmetric deep tendon reflexes, negative straight leg raising, and no evidence of radiculopathy. (Tr. 420). Dr. Doerger's impression was left paracervical and trapezius muscle strain;[3] and she felt imaging was not needed since there were no neurological deficits or acute trauma. (Tr. 420). She administered a Toradol injection and prescribed muscle relaxants. (Tr. 420).

On June 30, 2008, Plaintiff stated that he had not yet filled his prescription for Flexeril. (Tr. 408). A neck examination again showed only mild, diffuse tenderness of the musculature with no tenderness over the cervical spine or back. (Tr. 410). Plaintiff had full range of motion in his neck and back with a normal gait. (Id.) A neurological

---

[3] "Paracervical" is defined as "of, relating to, or occurring in the neck and especially the back part of the neck." http://www.merriam-webster.com/medical/paracervical. (Last visited August 3, 2012). "Trapezius muscle" is "[e]ither of two large flat triangular muscles running from the base of the occiput to the middle of the back that support and make it possible to raise the head and shoulders." http://www.thefreedictionary.com/trapezius. (Last visited August 3, 2012).

examination was also normal, other than Plaintiff's visual impairment in his left eye. (*Id*.) The doctor indicated that Plaintiff's neurological examination was "reassuring" and indicated that Plaintiff had cervical muscle spasm with a tension headache. (*Id*.)

Plaintiff sought ER treatment for back and muscle spasms on July 19, 2008. (Tr. 544). His neurological examination was again normal; he had paraspinal muscle spasms and decreased range of motion secondary to spasm. (Tr. 548). The doctor administered a Toradol injection and the medication Norflex, after which Plaintiff felt "much better". (Tr. 548). Plaintiff was discharged with a prescription for Motrin and Flexeril. (Tr. 548).

In August 2008, Plaintiff had a consultative examination with psychologist Dr. Flexman. (Tr. 473-78). He told Dr. Flexman that he could handle "all of the activities of daily living on his own." (Tr. 478). He stated that he took the bus or walked when he needed to go anywhere, that he prepared food throughout the day or went to food pantries, that he went to stores once a week, and that he did household chores such as laundry and general straightening up. (Tr. 478). He also said that he regularly went to thrift stores, attended church, watched television, talked with friends, and visited and talked with his siblings and father. (Tr. 478). Dr. Flexman noted that "[r]eliability was judged to be marginal and suggested moderate malingering or confusion." (Tr. 477).

Plaintiff returned to the ER twice in August 2008, reporting a recent episode of neck and left arm pain. (Tr. 523, 535). Physical examinations revealed paraspinal tenderness to palpation and normal neurological findings, including 5/5 muscle strength

throughout and normal sensation in the upper extremities. (Tr. 527, 537). Dr. Leibold felt imaging was unnecessary, administered Toradol and Valium for Plaintiff's pain, and provided a Flexeril prescription. (Tr. 527).

In September 2008, state agency physician Dr. McCloud reviewed the evidence and opined that Plaintiff could lift 25 pounds frequently and 50 pounds occasionally, citing, among other evidence, Plaintiff's imaging study results, complaints of neck pain and headache, and normal range of motion and gait. (Tr. 498). In December 2008, state agency physician Dr. Bolz reviewed the evidence and affirmed Dr. McCloud's assessment. (Tr. 556).

Plaintiff returned to the ER in September and October 2008, requesting medications for neck and low back pain. (Tr. 513, 515). He experienced no numbness, tingling, or weakness. (Tr. 515). Physical examination indicated that his neck was supple and non-tender with no masses, and he had no neurologic deficits. (Tr. 517).

Almost a year later, in August 2009, Plaintiff again complained of neck pain. (Tr. 595). Dr. Barhams, the primary care physician, noted decreased neck range of motion and tenderness in the paraspinal muscles and trapezius region. (Tr. 595). Plaintiff indicated to Dr. Barhams that Lodine made "his neck pain tolerable during the day," but he still had pain at night. (Tr. 593).

In September 2009, Plaintiff reported that Vicodin helped him sleep better. (Tr. 591). He had completed physical therapy, but reported that it made his pain worse. (*Id.*)

In October 2009, Plaintiff reported "doing better from a pain stand-point." (Tr.

590).

In January 2010, Plaintiff reported that the cold weather had triggered arthralgias[4] but that he was "doing well" with Vicodin. (Tr. 589). He complained of right arm numbness and tingling for the past two weeks when he extended his neck, but no pain or weakness. (*Id.*) Physical examination revealed normal range of motion, full muscle strength in both arms, and tenderness over the cervical spine and neck trapezius on the right. (*Id.*)

A February 2010 EMG and nerve conduction study of Plaintiff's right upper extremity showed mild C5-6 nerve root irritation. (Tr. 596).

An MRI of the cervical spine on June 10, 2010, showed multilevel degenerative disc disease.. (Tr. 608-09).

Plaintiff had a consultation in April 2010 with neurosurgeon Dr. Goodall, who stated that a physical examination showed decreased sensation in the right arm and decreased cervical range of motion, as well as positive Tinel's[5] and Spurling's[6] signs on

---

[4] Arthralgias is "[s]harp, severe pain, extending along a nerve or group of nerves, experienced in a joint and/or joints." http://medical-dictionary.thefreedictionary.com/arthralgia. (Last visited August 1, 2012).

[5] "Tinel's sign" is "a tingling sensation in the distal end of a limb when percussion is made over the site of a divided nerve. It indicates a partial lesion or the beginning regeneration of the nerve." http://medical-dictionary.thefreedictionary.com/Tinel%27s+sign. (Last visited August 1, 2012).

[6] "Spurling's signs" are derived from "[e]valuation for cervical nerve root impingement in which the patient extends the neck and rotates and laterally bends the head toward the symptomatic side; an axial compression force is then applied by the examiner through the top of the patient's head; the test is considered positive when the maneuver elicits the typical radicular arm pain." http://www.medilexicon.com/medicaldictionary.php?t=90833. (Last visited August 1, 2012).

the right.(Tr. 612).  Dr. Goodall diagnosed cervical radiculopathy and right carpal tunnel syndrome.  (Id.).

In June 2010, Dr. Goodall reviewed the most recent cervical MRI and noted disc pathology at C6-C7 on the right and at the central disc at C3-C4, noting that the C6-C7 lesion was most consistent with Plaintiff's complaints.  (Tr. 611).

In July 2010, Dr. Barhams noted that, following Plaintiff's neurosurgery consultation with Dr. Goodall, Plaintiff chose to defer surgery and physical medicine and rehabilitation, but would remain on Vicodin and Flexeril.  (Tr. 587).

Plaintiff was referred to pain specialist Dr. Ahmed, who administered cervical epidural steroid injections in September and November 2010.  (Tr. 600, 603-04).  Plaintiff reported that the injections only provided short-term relief.  (Tr. 598, 601).  He had no side effects from his medications except for constipation.  (Tr. 598, 601).  Dr. Ahmed felt that the best course was to continue medications and suspend injections.  (Tr. 599).

In October 2010, Dr. Pedoto of the Rehabilitation Institute of Ohio completed a Basic Medical form for the Ohio Department of Job and Family Services, in which he indicated that Plaintiff's health was good/stable with treatment and that Plaintiff was employable.  (Tr. 507).  He indicated that additional treatment should include physical therapy for Plaintiff's neck pain and an EMG to rule out radiculopathy.  (Tr. 506).  He opined that Plaintiff could lift 11 to 20 pounds occasionally eight to 10 pounds frequently.  (Tr. 507).

Plaintiff's Testimony:

Plaintiff testified that he is unable to work due to back and neck pain, muscle spasms, chest pain, migraine headaches, and left eye blindness. (Tr. 40-44, 49). At the hearing, Plaintiff estimated that he can sit no more than 15 to 20 minutes at a time, that he was unable to stand "for long," and that he could not lift more than a few loaves of bread. (Tr. 44-45). He lived alone in an apartment and usually rested and watched television for most of the day. (Tr. 38, 47). He was able to perform activities of personal care and do housework, but only short periods of time. (Tr. 45-48).

In his disability paperwork, Plaintiff further alleged that he was limited to lifting 10 pounds (Tr. 185), and that his symptoms affected his ability to lift, stand, walk, sit, climb stairs, kneel, squat, bend, reach, see, remember, concentrate, and get along with others. (Tr. 243).

Vocational Expert's Testimony:

The vocational expert testified that a hypothetical individual with Plaintiff's vocational profile with useful vision only in his right eye would not be able to perform driving jobs. (Tr. 53). Even so, such a person could perform 40,000 medium unskilled jobs and 40,000 light unskilled jobs. (*Id*.) If the hypothetical person were further limited to light unskilled work that entailed lifting no more than 10 pounds, the number of available jobs would be reduced to 15,000. (Tr. 53-54).

The ALJ's Decision:

The ALJ found that Plaintiff met the insured status requirements of the Social Security Act through December 31, 2008, but not thereafter. (Tr. 11). At Step Two of the sequential evaluation process, the ALJ found that Plaintiff had the severe impairments of cervical degenerative disc disease and a detached retina and blindness in the left eye, and found other non-severe impairments as well. (Tr. 12-13). At Step Three, the ALJ determined that Plaintiff did not have an impairment or combination of impairments that met or medically equaled a listing. (Tr. 15). The ALJ found that Plaintiff retained the residual functional capacity ("RFC")[7] to perform medium work except that he could not perform commercial driving as part of his job duties. (Id.) The ALJ found that Plaintiff was unable to perform any past relevant work at Step Four, but identified numerous light and medium unskilled jobs that Plaintiff could perform at Step Five. (Tr. 20-22).

**B.**

First, Plaintiff claims that the Commissioner erred when he issued a decision denying Plaintiff's application that was not based on substantial evidence. (Doc. 7 at 3). The Commissioner held that Plaintiff did not meet or equal Listing 1.04,[8] which concerns disorders of the spine. (Tr. 15).

---

[7] The Agency defines RFC as "the most you can still do despite your limitations." 20 C.F.R. § 404.1545(a)(1).

[8] Listing 1.04 refers to "[d]isorders of the spine (e.g., herniated nucleus pulposus, spinal arachnoiditis, spinal stenosis, osteoarthritis, degenerative disc disease, facet arthritis, vertebral fracture), resulting in compromise of a nerve root . . . or the spinal cord." 20 C.F.R. § 404(p) (2010).

The record reflects that:

In April 2010, Dr. Thomas Goodall diagnosed Plaintiff with possible cervical radiculopathy and right carpal tunnel syndrom, noting that Plaintiff had decreased sensation and cervical range of motion in addition to Tinel's and Spurling's signs on the right side. (Tr. 17, citing Ex. 19F, 16). However, other medical evidence indicates the contrary.

Dr. Akira Barnhams, who saw Plaintiff between August 2009 and October 2010, indicated that Plaintiff showed simply a decrease in range of motion in his neck and tenderness in the paraspinal muscles. (Tr. 17 citing Ex. 18F, 2-11). In fact, "[n]eurological examinations were consistently normal and showed normal reflexes, intact cranial nerves, normal muscle tone, full muscle strength in the extremities, and a normal gait." (Tr. 17 citing Ex. 18F, 2-11). On February 18, 2007, Plaintiff had an MRI completed on his cervical spine; this showed multilevel disc protrusion at C3-T1 with pressure on the cord at C5-6, mass effect on the right nerve root at C6, and slight narrowing of the left nerve root at C7-T1. However, the MRI contained no evidence of stenosis. (Tr. 16 citing Ex. 2F, 4-5).

Plaintiff had another MRI, completed on June 10, 2010, that indicated a central disc bulge with mild neural foraminal narrowing and no significant stenosis at C3-4, an eccentric disc bulge at C6-7 with mild recess and neural foraminal narrowing, and a lack of significant central canal stenosis. (Tr. 16 citing Ex. 19F, 12-13). Further, on July 10,

2007, Plaintiff had a CT scan of his cervical spine that showed spurring at C5-C7, but illuminated normal vertebral body heights and preserved disc spaces. (Tr. 16 citing Ex. 4F, 94). Finally, the ALJ points to an EMG and nerve conduction study of Plaintiff's upper right extremity completed on February 27, 2010; these tests showed mild C5-6 nerve root irritation with no evidence of cervical radiculopathy, peripheral neuropathy, myopathy, or borderline carpal tunnel syndrome. (Tr. 16-17 citing Ex. 18F and 19F, 12).

Plaintiff has not worked since March 21, 2008, but did not leave his previous employment due to his reported medical issues. (Tr. 12, 432). Plaintiff stated that he stopped working as a housekeeper because he was "tired of the work;" he stopped working as a donations collector because the work was seasonal; and he stopped working as a driver for a limousine company because his driver's license was suspended for failure to pay moving violations. (Tr. 432).

Contrary to the medical evidence, Dr. Michael Pedoto, who examined Plaintiff for the Ohio Department of Job and Family Services on October 7, 2008, indicated that Plaintiff could lift and/or carry no more than 20 pounds occasionally and 10 pounds frequently, sit for no more than one hour at a time or a total of six to eight hours, and stand and/or walk for no more than 30-60 minutes at a time or for a total of one to two hours. Dr. Pedoto concluded that Plaintiff was employable. (Tr. 20 citing Ex. 12F, 2-3).

Considering the totality of the evidence, the ALJ was correct in holding that the record does not contain substantial evidence that Plaintiff suffered from a spine disorder

with nerve root compression as required by Listing 1.04. Moreover, the ALJ rightfully determined that Plaintiff's "statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent with the [] residual functional capacity assessment." (Tr. 16). The ALJ properly found that Plaintiff had the RFC to perform medium work (but not commercial driving), because Plaintiff's statements about his disabling pain are not substantiated by medical evidence. (Tr. 15, 17).

### C.

Plaintiff also claims that the ALJ erred as a matter of law when she inappropriately concluded that his alleged substance abuse was a factor before determining that he was disabled. Plaintiff alleges that the "ALJ should have reserved any findings regarding the effects of Easley's substance abuse until after [s]he determined whether Easley was disabled." (Doc. 7 at 8). Plaintiff claims that the ALJ erred in this matter because her decision "fails to note whether it considered the 416.935 procedures[,]"[9] which "may be more than a simple oversight and may be a reflection of the ALJ's silent disregard for the Commissioner's regulations." (Doc. 7 at 8-9) (citing *Brueggeman v. Barhnhart*, 348 F.3d 689, 694 (8th Cir. 2003)).

---

[9] 20 C.F.R. 416.935 provides that "[i]f we find that you are disabled and have medical evidence of your drug addiction or alcoholism, we must determine whether your drug addiction or alcoholism is a contributing factor material to the determination of disability, unless we find that you are eligible for benefits because of your age or blindness."

The record indicates that while Plaintiff's substance abuse was a "severe" impairment in his previous unfavorable decision, the record does not support it as such now. (Tr. 12, citing Exs. 1A and 16A). Further, the Plaintiff provided inconsistent statements regarding when he stopped using drugs and alcohol; in June, 2008, Plaintiff indicated he had not used drugs or alcohol since January 2007, but in August, 2008, Plaintiff said he had stopped in October, 2007. (Tr. 18, citing Ex. 6F, 6 and Ex. 8F, 4). Moreover, in June, 2011, Plaintiff indicated he "drinks occasional alcohol." (Tr. 617).

Plaintiff fails to point to any evidence in the record that the ALJ determined Plaintiff's substance abuse was a factor before determining that he was disabled. As such, the ALJ's findings are supported by substantial evidence.

### III.

For the foregoing reasons, Plaintiff's assignments of error are unavailing. The ALJ's decision is supported by substantial evidence and is affirmed.

**IT IS THEREFORE ORDERED THAT** the decision of the Commissioner, that Kevin Easley was not entitled to disability insurance benefits and supplemental security income, is found **SUPPORTED BY SUBSTANTIAL EVIDENCE**, and **AFFIRMED**; and, as no further matters remain pending for the Court's review, this case is **CLOSED.**

Date:  _8/7/12_                                          _s/ Timothy S. Black_
                                                                           Timothy S. Black
                                                                           United States District Judge